Our next case is Georgetown Rail Equipment, 16-22-97. The case is Georgetown Rail Equipment v. Holland L.P. Okay, let's move on with the next argument. Counselor Schwartz, you reserve three minutes for rebuttal, correct? Yes, Your Honor. And you're here for Georgetown Rail Equipment. Okay, you may proceed. Good morning, Your Honors. May it please the Court, I'm Dan Schwartz with Favery Baker Daniels. With me today is Jordan Wolf, President of Holland L.P. and General Counsel Greg Preeves of Holland's corporate parent. Your Honors, this morning, there's no doubt, there's no evidence, no substantial evidence whatsoever upon which the jury's verdict in the district court's denial of our J-Mole motions and our Rule 50 motions can be affirmed. And I'd like to just hop right into it. There are two issues on infringement and one on damages that I'd like to discuss. The first issue is that Georgetown could not present any evidence, much less any substantial evidence, of an actual act of infringement because, very frankly- Do you agree that Holland used the plate-cutting system on U.P.'s track in Omaha and then sent the data to Rail Vision for processing? I believe you're referring to maybe one of the exhibits that's referenced. The use the Rail Vision system, I want to be sure we're using the right terminology. I didn't say use. I said use the plate-cutting system. Right. I'm sorry, Your Honor. And then sent it to Rail Vision. Holland collected data on six miles of track outside of Omaha, Nebraska. Let me be clear, that wasn't part of the Yuma demonstration, which is a big part of this case. They collected six miles, data for six miles of track. I assumed Yuma was in Arizona. Yes, it is. And so that's why the Omaha track that's referred to is- Is in Nebraska. Yes. But I want to be sure that the court understands that it's a different alleged use by Georgetown than what the court found to be an actual act of infringement in this case in connection with the Yuma demonstration. But it was before the jury. What was, Your Honor? The Omaha testing, the 91 miles west of Omaha. The six miles of test data? Yes. That exhibit was before the jury. And it was also before the jury that there was no evidence whatsoever that that data was processed. And the claim here requires lights and cameras, which was the data collection part of it, that Holland had on its trucks and ran outside of Omaha for six miles. But there was no data processing done. Whether it's in connection with the test in Omaha or Yuma or anywhere else. Was it sent to Rail Vision in the U.K.? The data from Omaha, that test data, was sent to Rail Vision for data validation purposes. There's no evidence whatsoever that suggests that Rail Vision actually processed it. And even if there was some inference, which I don't believe would be in any way correct to make, that there was processing, there was no evidence that it was processed for plate cut or plate misalignment, which is exactly what the claim requires, because there's nothing that ever came back. The farthest that that example goes is Holland collecting data and sending it off. So if you look at the claim structure where there's elements A, B, and C, Holland did A and B. We don't know, and there's no evidence of a C ever happening. But you did send the data. That particular set of data, yes, that was six miles. So your claim is you didn't use the system because of that. Well, yes, because the system requires a data processor that has a particular algorithm for processing that data to determine something about a railroad track. And that particular something is the plate cut, which was never done. In this argument, how do you avoid centillion data and this court's definition of use? So, Your Honor, centillion and then the case that it kind of used to build the definition of use of a system claim, it's really born out of kind of evolutions of technology, right? In centillion, it was a back-end billing system for a telecommunications company. And in order to get your billing information, you either subscribed to the system, and you did it through your computer. You know, my law firm may be a subscriber of that service, for instance. And you subscribe by hitting enter on your computer. And as soon as you did that, that system operated continuously and automatically. Electrons were flowing. Information was flowing. There were no intervening acts. There were no intervening actors. To control the system, all you had to do is put it in motion by hitting enter. The same thing in NTP. In centillion, we say that we don't require that every step of the system be used. I don't believe that you say every step. Or be practiced. Every step of the system. Every element of the system. Every element of the system, Your Honor, with all due respect, in order to find infringement, there has to be each of the elements of the claim. But our law for the term used is that not every element of the system has to be practiced. Correct? You mean by a single party? Yes. By a party. And I'm asking because you're saying that you sent the data off, but you don't know if it was ever tested or not. Right. And therefore, you're not infringing. Correct. That doesn't seem to comport with centillion. Well, I think it falls squarely within centillion. In centillion, and again, I'll also reference the NTP case because it was the basis for the definition of use in these kinds of cases. The user hit enter on his or her computer to get the billing information. And in NTP, Blackberry case, somebody would type out a message and hit send. And as soon as they did that, the system itself operated as if it was supposed to, as it was intended to. There was nothing that could stop it. It wasn't like in centillion. The distinction would have been if I had to mail in a request to Quest, who was the back-end processor in centillion, and say, I'd like you to pull my data. How is that different in this case? In centillion, we said that to find use, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it. In your testing, didn't you put it into service? All we did, all Holland did was collect data. Wait a minute. Yes, sir. You did contract with UP, yes? We had data collection contracts, contracts that referred to us, Holland, collecting data, not processing data. If you're referring to the change order, the September 12th change order, Okay. The change order very specifically says that we are only collecting data. Georgetown made a big point. Do you agree that it constituted a binding sale? Of the infringing system, absolutely not. What did you sell to them? In the change order, we actually sold them nothing. What that change order was, as testified by Mr. Matterman, was literally a placeholder under a much bigger contract that Georgetown had with Union Pacific for all sorts of testing services, not just anything related to plate cut or plate misalignment. They measured rail geometry, and they measured rail head profile, all sorts of different things. So this was an addendum to that contract. And it allowed Union Pacific to order certain additional services, again, not limited to rail visions, if it ever wanted it to, for up to $6.9 million worth of those services. As it turned out, during the entire time of that change order, Union Pacific never ordered a single one of those services. So there was not, when you say what did we sell to them, we gave them the right to order or request Holland to collect data. And they were still, as the evidence also shows, rail visions system was nowhere close to being operational, which is why there's no data coming back, which is why there were no reports that were ever put in at trial showing any process data. If there were reports showing process data, it surely would have been in front of the jury. What was the relationship between your client and Rail Vision? I.e., was it contractual? Yes, they had contracts. They had development contracts and other contracts. Contracts also not having anything to do with this technology. They had contracts. Were there contracts that had to do with this technology? This technology being Holland would collect data. Rail Vision would try to process the data for certain purposes that it also were hoped to include at some point. Contracts that tried to process. They were developing it. I'm not sure I would say try to process, but Rail Vision was very clear that they were still developing that. Your Honor, if I may, I mean, just by way of example, I would refer to Appendix 10754, which is one of the proposals that. What volume are you in? Volume 9, Your Honor. Thank you. Your Honor, 10754. 10754. 10754. Oh, I'm sorry, volume 10. You're in the next volume. Yeah, I'm sorry, Your Honors. Volume 10. I apologize. That's what happens when you have 11 volumes. And while you're looking, if I may, Your Honors, just a little bit of explanation. First of all, this is a document from March 12th of 2013. Why is that relevant? That's relevant because it's almost a year after the Yuma demonstration, which the district court found was a use. And it's also six, seven months after that change order between Holland and Union Pacific. And if you go to, at 10754, there's kind of a history of what is going on between Holland and UP, and the EC11 truck that's in that first paragraph there, that's Union Pacific's truck, and Holland had helped install some data collection equipment on there, so that UP could, on their own, maybe run this on their track without having to use Holland's trucks to do it. The Holland track star shows that they had some of the data collection equipment.  Holland, and I believe, Your Honor, that there was some help from Rail Vision with the actual equipment, but Holland was the one who installed the data collection equipment. There's no data processing on any of this. And if you go to the proposals that are set forth in here, These are the options? The options, exactly, Your Honor. It's at 754 and 755 at the bottom of those pages. Option one refers to RV Rail Vision, providing all software and hardware tools and processing resources and development necessary to deliver information to UP. Rail Vision is processing. Rail Vision is developing this. And Rail Vision is the one who's going to be providing information back to Holland. Excuse me, to UP, I apologize. I don't see how this helps your argument. I don't see where you're going with this. This is on the Holland, this is an offer from Holland. And you're dealing with Centillion. Centillion defines the use of a system claim, whether a party controls a system as a whole or obtain a benefit from it. This document seems to me to show control and benefit. Control is, as shown in the cases like Centillion and NCP. It's a contract. You're negotiating, you're telling them how to. If I may, I'm sorry, I apologize. If all we're doing is relying on contracts, there are other, that's not what Centillion covers. Centillion is not about contractual relationships, mere contractual relationships. It's about control. It's about control. If you want to talk about the contractual relationships, that's a vicarious liability. No, I want to talk about control. Right, and there is not a single case based on Centillion that rises or falls on the existence of a contract. I mean, there are no cases that say just because there's a contract in place. Let me see if I can give you an example. Let's just pretend we can call it evidence. Okay. Rather than rising or falling on existence, it's evidence of a relationship. Absolutely, Your Honor, evidence of a relationship. And it's evidence that a party is holding itself out as able to do certain things. I will respectfully disagree with you, Your Honor. Holland wasn't saying that it could process data. All of these say Rail Vision is processing the data. No, no, no, no, no. Listen to me again. I'm sorry, Your Honor. There's evidence that it can do certain things. Yes. Yes. My response to that, Your Honor, would be it only did certain things, elements A and B, of the asserted claim here. There's an element C, and if you – it is not the case. You're backing into Centillion again. No. If all you're saying, Your Honor, it is not the case and it is not the law that a mere contract gives rise to control. There is no support for that whatsoever. It may be evidence if the contract suggests it, but here these contracts make very clear You're arguing against a straw person, as we used to say at first. This document, it's got a plaintiff's exhibit number on it. It went before the jury. Yes, it was before the jury. So why can't we say that the jury looked at that and found that as evidence of control? Because as a matter of – oh, I'm sorry. In dispute or contrary to your argument, you did everything except to evaluate the data. You sent the data and you did everything, and your argument is we didn't infringe because we didn't evaluate the data, but you're also telling us that the evaluation process wasn't complete, correct? The evaluation is the most important part of it. All we were doing was collecting data. Why are you sending data to a company who you claim doesn't even – is able to evaluate it? They were trying to develop it. That's – I mean, you know, option two. Aren't you demonstrating that we haul and control the system? I mean, we can even send it to evaluation. Once they're up and running, this is how it's all going to work. We send the data. They evaluate it. We bill you. You pay us. Holland, all of those things, who pays who, contracts between parties, none of those things have been used for control. Control is basically – my colleagues may laugh at me here because I think of it as a Rube Goldberg machine. Are you guys familiar with the Rube Goldberg machine? You put a ball in one side and it kind of goes through a hole seriously. Once you put that ball in, it rolls automatically. And there's nothing anyone can do to stop it. Here, there were so many things. In that same – the same exhibit, 10.754, it talks about how when Rail Vision got the data, there was nothing automatic. There was nothing immediate. There was nothing that you hit send. We had to send it on a plane overseas. There were 40 – for each 100 miles of track. And I realize I might be arguing to the straw man over here, but I'm going to win you over. I'm sitting here thinking of a Rube Goldberg argument. You put it in over here. Right. It goes around, goes around. Right. And the person can't stop that ball from rolling, can it? They can't stop it from rolling. Here, somebody put the ball in, it got to one of the next stops, and somebody had to do something. And it wasn't Holland. It was Rail Vision. And for 100 miles of track at this point, a year after the alleged acts of infringement here, a year after, they still had to spend 42 man hours manually working on this. There was nothing automatic about this. Okay. Let's hear what the other side has to say. You're over your time. We took you over that time. We'll restore you the time. Thank you, Your Honor. Counselor Herbertholtz. Good morning. May it please the Court. I'd like to emphasize two points during my time this morning. The first is on the issue of infringement. The second is on the issue of damages. And central to each of these two points is that the substantial evidence standard, the standard of review that applies here, warrants affirmance. This is a case involving a jury verdict, and this Court is well familiar. Fifth Circuit law, which applies here, is especially deferential to a jury's infringement findings. In fact, it's so deferential to a jury's findings that to prevail on this appeal, Holland needs to demonstrate that the evidence so substantially and overwhelmingly, so strongly and overwhelmingly, I should say, falls in its favor that no reasonable juror could possibly find to demonstrate it. Let me ask you a question where I sort of began in Omaha, and that is your opponent's argument that one can only look to the human demonstration and not to the Omaha. That's correct, Your Honor. Let me answer that by instructing the Court or asking the Court to take a look at pages 1135 through 1141 of the record. During that particular portion, which I can't read in open court, Mr. Matterham, Holland's representative, specifically testifies that Holland collected data for customers that are named in there, sent the data to the Rail Vision Company for processing, received the results of that processing back, and gave that information to customers. There's a more complete explanation of all the other acts of infringement in Mr. Matterham's testimony on pages 1132 through 1145. Do you have a volume number? That's volume two, Your Honor. Volume two, I'm sorry. And that is a range. I know it's about 15 pages that we cited there, but there is substantial evidence in that one portion of Mr. Matterham's testimony alone that Holland made infringing uses of the rail vision systems. The human demonstration, as the Court correctly held, was also an infringing use. The problem that Holland has is that is the only use that it refers to in its briefing. It completely ignores all the other evidence of Holland's infringing uses, which we've summarized on pages 36 and 37 of our brief. Turning to your question, Your Honor, about the Omaha demonstration, I will point out that the argument this morning that that was simply collected for data validation purposes, I believe is what I heard, is a brand-new argument. We've never heard that today. That was never briefed. That certainly wasn't brought to the attention of the trial court. And just like the Yuma demonstration argument that Holland is making and that Georgetown allegedly didn't prove that that data was processed, that's a brand-new argument as well. These are the types of arguments that should have been brought to the Court's attention before the case was submitted to a jury, because Holland waived them otherwise. That would have given Georgetown an opportunity, to the extent that there were any deficiencies in the evidence, and we don't believe there were, to cure any of those defects. But by not bringing these arguments to the attention of the trial court, we had no such opportunity. So we submit that the arguments about the Yuma processing  In addition to the testimony from Mr. Matterham, there is substantial evidence beyond that in the record to show Holland's infringing uses. You'll find articles in the record showing that Holland was advertising its infringing technology, specifically its rail-vision plate-cutting technology. Those can be found at pages 10920-23 of the appendix, and that's volume 10. There was also an exchange of correspondence prior to this lawsuit between Holland and Georgetown in an effort to demonstrate that it didn't infringe any claims of Georgetown's 329 patent. Holland admitted that it was using the rail-vision systems, in its words, solely to measure plate-cut, and that was the focus of the system. That correspondence can be found on pages, volume 11, pages 10925-27 of the record. In addition to that, there are... Could you address your opponent's argument that they did not infringe because they didn't process or they didn't practice the last element, and that's to process the data? Yes, Your Honor, and I would direct the Court's attention to the Centillion case. We believe that the portion of Centillion dealing with the customer, or the subscriber, I should say, is directly on point in that case. Just like the subscriber in that case who put the infringing system into use by signing up for monthly billing from the telecommunications company, it didn't matter that the back-end processing in that case was performed off-site or on another computer or using different servers. The same is true in this case. It doesn't matter that the processing is taking place in the U.K. It doesn't matter that the data has to be shipped there, that it takes a certain amount of time for that data to get there. The point is, is that Georgetown presented substantial evidence that Holland was benefiting and controlling... What is your opponent's argument that processing never took place? Well, I would again refer the Court to the section of testimony that we cited there on pages 1132 through 45. Another useful part of the testimony that I think the Court should take a look at is on pages 1102. It's in Volume 2, and in that particular section... 1102, you said? Yes, 1103 on Volume 2, and in that particular portion of testimony, Mr. Matterhorn, Holland's representative, testifies that simply collecting data by itself for customers is not helpful. He testified that you, quote, can't do anything with that data until it's processed. So there's more than sufficient evidence for a jury to infer that all of the data that Holland collected from all these demonstrations and uses was processed by the Rail Vision Company. That's the entire point of the arrangement that Holland had with the Rail Vision Company. On the issue of damages, Your Honor, the District Court also got it right in determining that Georgetown presented sufficient evidence and substantial evidence on each of the four Panduit factors. Only two of those factors are in dispute in this case, the first factor on consumer demand and the fourth factor on the calculation of lost profits. Respectfully, I don't think that there's any dispute here about demand for the patented invention. Georgetown elicited substantial testimony... But wasn't the evidence on lost profits the actual value that was at zero, correct? No, we don't believe it was at zero. The evidence of lost profits that Dr. Ugone, Georgetown's damages expert, discussed was based on a series of several acts of infringement by Holland leading up to and ultimately culminating in a change order contract that Holland ended up getting with Union Pacific. And Dr. Ugone specifically talked about the evidence that he considered in relation to the Yuma demonstration and the change order and said that he did not limit his opinions to those particular acts of infringement. And you can see that in the record on pages 16, 19 through 20. And also I'll point out that in the calculation of lost profits, this isn't a case where Dr. Ugone just simply made up numbers that were speculative or not based on economic reality. He analyzed the relevant industry, the market. He analyzed Georgetown's contracts that it already had with four out of the seven class one railroad companies and he analyzed the terms of those. He analyzed the terms of the proposals that Georgetown sent to Union Pacific shortly before Union Pacific awarded the work to Holland and not to Georgetown. Based on that evidence, he came up with a calculation of the total revenues that Georgetown would have realized under its contract with Union Pacific. How do you deal with their argument that the compensation they received before that preliminary injunction went into effect was for work on trucks that did not have the plate cutting technology? I don't think there's any record support for that, Your Honor. The other point that I want to make here is Holland spends considerable time arguing that Georgetown isn't entitled to lost profits simply because Holland allegedly didn't make any revenue under its change order contract with Union Pacific. The problem with that, as we've explained in our briefing, is that that focuses the inquiry entirely away from Georgetown, the patent owner, and puts it entirely on the acts of the accused infringer, or the infringer in this case. And Section 284 of the Patent Act is designed to compensate and make the patent owner whole for the acts of infringement. If we completely ignore all of Holland's acts of infringement leading up to the change order and focus on what happened after, then we're missing the point. Is this a two-player market? It is, Your Honor. It is, Your Honor. It is a two-player market. Is Georgetown and Holland? It is Georgetown and Holland competing for a small handful. So any sale that, if they're infringing, any sale gained by Holland is at your loss? Exactly, Your Honor. But if they don't show that they gained a sale, it's a two-player market, and they've established, and I think the evidence may show, that they had no sales, no eventual sales. Right. I understand the question. What I would go back to is that Georgetown satisfied each of the four Panduit factors, and in doing so created a but-for presumption that it would have made the profits that Georgetown's expert testified about. I realize that many cases— There were sales because of the preliminary injunction that went into effect. Yes, Your Honor, that is true, that there were no sales after the preliminary injunction went into effect. And what the preliminary injunction did for Georgetown is that it ensured that Georgetown wouldn't suffer any economic harm that was impossible to calculate. It ensured that Georgetown, for example, was protected from Holland using its infringing technology to strengthen its business relationship with Union Pacific, to ensure that Holland wasn't able to provide ancillary sales of other equipment and processes and the same is true for Georgetown. So if there's no lost sales, then isn't any methodology you have to establish lost profits? Isn't that speculative? We don't believe it's speculative at all, Your Honor. In fact, we would go back to Panduit and point out that because Georgetown satisfied each of those factors, including the calculation of lost profits, that Georgetown met its prima facie burden of satisfying Panduit, and that then shifted the burden to Holland to demonstrate that that calculation was unreasonable. And the problem Holland has on the calculation is that it presented no alternative evidence or no alternative calculation to the jury. Instead, what it did is it simply challenged the sufficiency of Georgetown's evidence of causation. But as this court has held, that's a classical jury question that the jury is to resolve, not Holland's expert. And again, just to finish up my point on the first Panduit factor on consumer demand, again, there is substantial evidence in the record that consumers were demanding Georgetown's patented technology, its Aurora technology, and Holland stipulated at trial that that technology practices Claim 16 of the 329 patent. I'm guessing that your two-seller market is also your response to their argument that the UP contract was non-exclusive. That's exactly right, Your Honor. So, Your Honor, unless the court has any further questions, I'll cede my time to Holland. We don't have any additional questions. Thank you. Thank you. Attorney Schwartz, you have two minutes. Thank you, Your Honor. With respect to Omaha, the document, there's no new argument here. The document is an email only between Holland, not between anyone at Rail Vision, not between anyone at Union Pacific, and it talks about testing six miles of track. It talks about the problems they were having with the lasers and the lights. They were just trying to get the document reads for itself that they're just trying to see if this system worked. That's all it was. That's not a new argument. That's exactly what the document says on its plain face. I would also suggest, Your Honors, that here the issue really is this claim requires three elements. And that third one is really important. It's the process. And to say only that Mr. Matterham testified to this, which isn't linked to a single particular project, a singular particular customer, these were prophetic statements that Mr. Matterham talked about. Well, yes, in our relationship with Rail Vision, we would like to have them process the data and send it back to our customers. That's what we're trying to do. But if there was really processed data, if there was really a report showing what ties were graded in what way, it would have been in front of the jury. They don't have it. Union Pacific, the one customer here that they're relying on everything for with respect to their damages claim and the infringement case, we don't see any data processed by Rail Vision. That is fatal, absolutely fatal to them. They could have brought Union Pacific to trial. They didn't. They could have asked them what they did. They didn't. They've never alleged that somehow we withheld the reports. All they did was ask Mr. Matterham some prophetic questions. I would refer the court to the Occo Brands case versus ABA locks that talks about the specific evidence of infringement. In that case, there were ways to infringe and ways not to infringe. And the court very clearly said, you have to have express evidence of direct infringement. It can't be these kind of pie-in-the-sky statements that somebody may have done it. On damages, Your Honors, this is entirely speculative. You are 100% right that the issue of Holland not earning a single dollar of revenue, we're not talking about profits, revenue, means that if you swapped out Holland for Georgetown in that change order at that moment, Union Pacific still would have ordered zero. And Your Honors right, it was a non-exclusive contract. And what do we know about this whole process? If Union Pacific wanted to, they could have walked over to Georgetown, who they also had a pre-existing relationship with, as set forth in the record, with some other parts of their business, said, we want you to provide this, whether before or after the preliminary injunction. And it simply didn't happen. OK, Counselor, can you conclude for us, please? That's all I have, Your Honor. Thank you very much. Thank you very much.